IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS AT KANSAS CITY

CHARLES SCIOLARO, M.D., and
KANSAS HEART AND LUNG
SURGERY, INC.,

**Plaintiffs**

v.

Case No. 08-CV-2399 CM/DJW

PROVIDENCE MEDICAL CENTER, INC.,
MICHAEL J. BEEZLEY, M.D.,
LORI A. LINDSTROM, M.D.,
WADE L. WILLIAMS, M.D. and
MICHAEL F. MEURER, M.D.,

**Defendants.**

## <u>COMPLAINT</u>

COME NOW Plaintiffs, **Charles Sciolaro, M.D.** ("**Dr. Sciolaro**") and **Kansas**

**Heart and Lung Surgery, Inc.**, ("**Kansas Heart and Lung Surgery**), (collectively

"**Plaintiffs**") and for their causes of action against **Defendants**, state and allege as

follows:

### PARTIES, JUSRISDICTION AND VENUE

1.     **Plaintiff Dr. Sciolaro** is an individual who resides in Leawood, Johnson

County, Kansas. **Dr. Sciolaro** is a physician licensed by the Kansas Board of Healing

Arts to practice medicine, and practices cardiothoracic and vascular surgery in the State

of Kansas, including Wyandotte and Johnson County, Kansas.

2.     **Plaintiff Kansas Heart and Lung Surgery** is a professional corporation,

organized and existing under the laws of the State of Kansas, and having a principal place

1

of business in Kansas City, Wyandotte County, Kansas. **Kansas Heart and Lung Surgery** is a sub-chapter S corporation, wholly owned by **Dr. Sciolaro**.

3.      **Defendant Providence Medical Center, Inc. ("Providence" or "PMC")** is a not-for-profit corporation and existing under the laws of the State of Kansas, and having a principal place of business in Kansas City, Wyandotte County, Kansas. **Providence** can be served by serving its resident agent, James T. Paquette, at 8929 Parallel Parkway , Kansas City, KS 66112, or another officer, managing or general agent in charge of such office.

4.      **Defendant Michael J. Beezley, M.D. ("Dr. Beezley"** or one of the "surgeon **Defendants"**) is an individual who on  information and belief resides in Lenexa, Kansas. **Dr. Beezley** is licensed by the Kansas Board of Healing Arts to practice medicine, and practices medicine in the State of Kansas, including Wyandotte and Johnson County, Kansas.

5.      **Dr. Beezley**, at times relevant hereto, is and was an active member of the medical staff at **Providence**, and an agent of **Providence**, was chairman of the Multi-Specialty Review Committee at **Providence** from January 1, 2006 until December 31, 2006, was President-elect of the Medical Staff at **Providence** from January 1, 2006 until December 31, 2006, and then President of the Medical Staff from January 1, 2007 until Dec 31, 2007, all while maintaining a private medical practice in vascular surgery through his practice, Vascular Surgery Associates.

6.      **Dr. Beezley**, at times relevant hereto, was also a member of the Kansas Board of Healing Arts.

7.      **Dr. Beezley** can be served at Vascular Surgery Associates, 7420 Switzer Road, Shawnee Mission, Kansas 66203, or wherever he may be found.

8.      **Defendant Lori A. Lindstrom, M.D.** ("**Dr. Lindstrom**") is an individual who on information and belief resides in Lenexa, Kansas. **Dr. Lindstrom** is licensed by the Kansas Board of Healing Arts to practice medicine, and practices medicine in the State of Kansas, including Wyandotte County, Kansas.

9.      **Dr. Lindstrom**, at times relevant hereto, is and was an active member of the medical staff at **Providence**, an agent of **Providence**, and was President of the Medical Staff from January 1, 2006 until Dec 31, 2006, all while maintaining a private medical practice as a radiation oncologist.

10.     **Dr. Linstrom** can be served at Kansas City Cancer Center, 8929 Parallel Parkway, Kansas City, Kansas 66112 (located in the basement of **Providence**), or wherever she may be found.

11.     **Defendant Wade L. Williams, M.D.** ("**Dr. Williams**") is an individual who on information and belief resides in Shawnee, Kansas. **Dr. Williams** is licensed by the Kansas Board of Healing Arts to practice medicine, and practices medicine in the State of Kansas, including Wyandotte County, Kansas.

12.     **Dr. Williams**, at times relevant hereto, is and was an active member of the medical staff at **Providence**, and an agent of **Providence**, and was Chairman of the Multispecialty Review Committee at **Providence** from January 1, 2007 until December 31, 2007, then President of the Medical Staff since January 1, 2008, all while maintaining a private medical practice as a pulmonologist.

13.     **Dr. Williams** can be served at 10550 Quivira Road, Suite335, Overland Park, Kansas 66215, or wherever he may be found.

14.     **Defendant Michael Meurer, M.D.** ("**Dr. Meurer**" or one of the "surgeon **Defendants**") is an individual who on information and belief resides in Shawnee Mission, Kansas. **Dr. Meurer** is licensed by the Kansas Board of Healing Arts to practice medicine, and practices medicine in the State of Kansas, including Wyandotte County, Kansas.

15.     **Dr. Meurer**, at times relevant hereto, is and was an active member of the medical staff at **Providence**, and an agent of **Providence**, and was Chairman of the Special Ad Hoc Committee in November 2006, and was a member of the Multispecialty Review Committee during 2007, all while maintaining a medical practice as a cardiothoracic surgeon employed by **Providence's** own Providence Cardiothoracic Associates.

16.     **Dr. Meurer** can be served at 8919 Parallel Parkway, Suite 455, Kansas City, Kansas 66112, or wherever he may be found.

17.     This action arises under federal law, including 15 U.S.C. §§1, 4, 15, 24 and 26. Accordingly, this Court has jurisdiction pursuant to 15 U.S.C. §§4 and 15, and pursuant to 28 U.S.C. §1337.

18.     Jurisdiction is also founded pursuant to 28 U.S.C. §1331, upon a substantial question of federal law and violation of federal law, the Federal Health Care Quality Improvement Act of 1986 ("HCQI Act"), 42 U.S.C.A., § 11111, *et. seq.,* due to **Defendants'** conducting of a predatory and malicious peer review designed to cause economic harm to **Plaintiffs**.

4

19.     Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over all other claims in this Complaint, including state law and common law claims asserted herein, all of which arise out of and form part of the same controversy.

20.     Venue is proper in this District pursuant to 28 U.S.C.A §1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District, and because **Defendants** reside in this district. Venue as to each **Defendant** is proper in this judicial district pursuant to 15 U.S.C. §22 and 28 U.S.C. § 1391(b) and (c) in that each of **Defendants** transact business, are registered and/or licensed to transact business and are found in this judicial district. The unlawful activities done pursuant to the conspiracy and course of conduct herein alleged were carried out within the District of Kansas, and interstate trade and commerce was and is carried on within such District

## GENERAL BACKGROUND AND FACTS COMMON TO ALL COUNTS

### *Dr. Sciolaro's Background*

21.     **Dr. Sciolaro** graduated from the University of Kansas Medical School in 1984. He received his general surgery training at University of Arizona from 1984-1990. In 1985 he was selected to be the first cardiovascular fellow researching cardiac transplantation and the artificial heart. Later that year, **Dr. Sciolaro** was one of the first to learn how to implant internal cardiac defibrillators. In 1991, **Dr. Sciolaro** completed a specialized vascular and thoracic residency at the Kaiser Permanente Foundation Hospital. He completed a cardiovascular fellowship, and he was on the faculty at Loma Linda University.

22.     **Dr. Sciolaro** has been in private practice since 1993. His first practice was with two other cardiovascular surgeons in Alexandria, Louisiana. He obtained additional training at the Ochsner Clinic in New Orleans, Louisiana, Debakey Heart Institute in Houston, Texas, Dr. Dietrich's Arizona Vascular Institute, and had endovascular training in Chicago, Milwaukee, and Columbia. He enjoyed a successful cardiovascular and thoracic practice in Louisiana.

23.     In 1996 **Dr. Sciolaro** was recruited by Kanza Multispecialty Group to practice at Bethany Medical Center ("Bethany" or "BMC") and at Providence Medical Center (PMC). He was to see patients at both Kanza Multispecialty Medical offices at the Bethany Medical Building and Wyandotte Medical Building adjacent to BMC and PMC. **Dr. Sciolaro** was accepted as an active member in BMC and PMC medical staff after satisfying their credentialing requirement in 1997 with cardiology, pulmonary, cardiac surgery, thoracic surgery, general surgery, and peripheral vascular privileges. He paid PMC and BMC yearly medical staff dues.

24.     **Dr. Sciolaro** was asked to reestablish the cardiothoracic program at Baptist-Lutheran Medical Center in 2003 and later at Overland Park Regional Medical Center in 2005.

25.     During his career, **Dr. Sciolaro** has been involved with over 5,000 major cardiovascular/thoracic procedures, including over 150 adult and pediatric heart transplants, and 3 bridge to artificial Jarvik heart transplants. His morbidity and mortality rates are less than two percent, which is less than the National Average. He has worked with surgical pioneers including Drs. Copeland, Bailey, Dietrich, Gundry and the former Surgeon General of the United States, Richard Carmona. He has provided consultative

advice to a previous President of the United States and has operated on Hollywood celebrities. **Dr. Sciolaro** was on the Kansas City Board of the American Heart Association.

### *History of Competition at Providence*

26.     When **Dr. Sciolaro** started his surgical practice in Kansas City, Kansas he shared the emergency room BMC and **PMC** call schedules with three other cardiovascular surgeons, Dr. Frank Bichlemeir, Dr. Russell Carlson and Dr. Thomas V. Thomas.

27.     In 1997, Dr. Bichlemeir retired and Dr. Carlson relocated to another opportunity. In 1998, Columbia/HCA hospital organization purchased BMC.  The new BMC management recruited Gerald Early MD FACS a cardiovascular surgeon to help with the emergency room call schedule.

28.     In 1999, Sisters of Charity of Leavenworth, the managing partner for **PMC**, purchased BMC from Columbia/HCA Health Care and in 2000 merged BMC's medical staff with **PMC's** medical staff. The Sisters of Charity of Leavenworth later caused the Bethany's Hospital Buildings to be destroyed, forcing the urban patients to migrate west to **PMC** or south to Shawnee Mission Medical Center.

29.     Meanwhile, Dr. Early relocated to another opportunity and Dr. Thomas retired. **Dr. Sciolaro** was the only cardiovascular/thoracic surgeon on call 24/7 at Providence for about 3 years, with no surgeons to relieve him or cover for his schedule. Dr. Sciolaro repeatedly brought this to the attention of Providence's management.

30.     At the time **Dr. Sciolaro** became affiliated with **Providence Medical Center's** cardiovascular and thoracic program in October 1996, mortality rates of 15-

20% at **Providence** had been common for cardiothoracic surgical cases and the cardiology services. Since then, the cardiovascular and thoracic program has improved with the addition of the first assistant program and improvements in the operating room. There was rapid growth of the heart program and there was a quality 200 open-heart/year and a 125 major lung cases per year program.

31.     Finally, in 2001, the Sisters of Charity and **Providence** recruited **Dr. Michael Meurer**, a cardiovascular surgeon from Springfield, Missouri.  **Dr. Meurer** joined Dr. Hamner Hannah's cardiovascular surgical group in exchange for that group becoming members of **PMC's** medical staff.  One year later, Dr. Hannah's surgical group added another cardiovascular and thoracic surgeon, Dr. Prem Samuel.

32.     Dr. Hannah's surgical group lasted for about four years before deciding to leave the medical staff at **PMC** in 2005. With the advice of Allegiance/Cardinal Group, The Leifer Group, Health Group West and the Husch and the Blackwell Sanders law firm, **PMC** established **Providence's** current strategic cardiology service business plan. In consummation of this plan, **PMC** formed its own group, "Providence Cardiothoracic Associates" and **Dr. Meurer** and later **Dr. Rich**, a cardiovascular surgeon from California, became employed cardiovascular surgeons.  **Dr. Sciolaro** was not given the opportunity to join that group.

33.     **Dr. Beezley**, a competing peripheral vascular surgeon, and a member of Vascular Surgery Associates, along with **Dr. Connerlly**, and others. On information and belief, that group was formed in approximately 1989.

8

### *Problems at Providence*

34.     **PMC** became increasingly focused on maximizing revenues for itself and resisting equipment or facility expenditures that were reasonably necessary for maintaining safety and quality standards.

35.     **Dr. Sciolaro** became aware of these problems, and endeavored to have them addressed in the interest of patient safety and quality assurance, but these requests and efforts to improve facilities or equipment were often resisted or even resented by **PMC** and its OR management.

36.     Operating room equipment, conditions or safety concerns that **Dr. Sciolaro** has had to bring to the attention of **PMC** management and staff have included the following examples:

> a.  One of most concerning problems was the sterility of the equipment at **Providence**. Instruments coming from sterilizers must be verified as being sterile. **Dr. Sciolaro**, however, would have to delay surgery on a patient because sterility of the instruments could not be ascertained or confirmed.  The indicators on the sterilizers would not activate after the sterilization process to indicate sterile equipment and instruments. The equipment had to be placed in a different sterilizer so that a patient's surgery could proceed. **Dr. Sciolaro** had to bring this to the attention of **PMC's** staff on a basis. Providence's laboratory was not equipped to properly evaluate the sterile indicator sensors, but **Dr. Sciolaro** could not even obtain assurances that **PMC** sent the sterile

indicators back to the company for analysis. In addition, PMC's staff would place some of the instruments in cabinets for storage, creating uncertainty as to whether such instruments were in fact sterile. This sterility issue was recurring for other surgeons at PMC, as well (and might explain infection issues at PMC).

b.  Recurring problems of insect infestation in the operating room. The operating room did not have the customary preventive insecticide treatment. Flying insects were in the OR and landed on the sterile fields. This would require **Dr. Sciolaro** to cancel surgery until the flying insects were controlled. **Dr. Sciolaro** was continually ridiculed by **PMC's** OR management for canceling surgery. Ultimately, PMC installed ultraviolet lights in the OR and initiated scheduled insecticide treatments.

c.  Leaks in the pipes and ceiling tiles in the heart room that contaminated the operating room. Ultimately, the pipes and ceiling tiles were repaired or replaced.

d.  There have been failures of one or more temporary pacemaker generators.

e.  The cardiopulmonary bypass machine would malfunction, because **PMC** did not provide the requisite preventive maintenance and spare parts for the centrifugal pump machine. Ultimately, however, **PMC** had two pumps.

f.  While **Dr. Sciolaro** was performing an aortic valve replacement, **PMC's** lab and operating room personnel breached the standard of care by giving the patient the wrong blood type for an ABO incompatible blood transfusion. The patient required extensive physical therapy and rehabilitation in order to recover from this incident.

g.  On at least one occasion, OR personnel had to work in the dark while a patient was on cardiopulmonary bypass, because **PMC** did not have a back-up system. The perfusionist had to hand-crank the machine until the power was established. A backup system was subsequently installed.

h.  On at least one occasion, IV tubing (Braun) connectors provided by **PMC** were defective and cracked, causing intravenous medication to leak onto the bed rather than being infused into the patient, resulting in one occasion in the death of a patient.

i.  The cardiac defibrillator cable in the heart room was broken. **PMC's** OR management claimed the cable was not part of the budget. In the interim, the cable had to be repaired with plastic fastener ties. Several patients could have benefited with a functioning defibrillator. The defibrillator cables and defibrillators were ultimately replaced.

j.  On one occasion, the equipment utilized to save the life of a patient, who developed acute bleeding in the ICU, was old and dull and almost

useless. Despite this, Dr. Sciolaro was able to save the patient's life, the patient recovered, and returned home 7 days after surgery.

k.  On one occasion, a defective sternal saw malfunctioned during surgery and sprayed cleaning fluid and oil into a patient's subcutaneous sternal tissues. Open heart surgery had to be cancelled, and surgery rescheduled in 72 hours. The patient in question had a successful surgery. Ultimately, as a result of **Dr. Sciolaro's** insistence, **PMC** replaced its saws and acquired better equipment.

37.    **PMC** refused to provide a choice of pacemakers in its inventory, even when **Dr. Sciolaro** and all of the cardiologists at **PMC** requested that other technologically superior units be made available to better meet the specific clinical condition or needs of certain patients. It was ultimately revealed that **PMC** had entered into a collusive and anticompetitive contract with one manufacturer who provided **PMC** with as much as $1.5 million in annual "rebates" as a reward for declining to purchase and carry, or limiting the purchase, of products from competing manufactures. Such conduct, on information an belief, may have violated Kansas law and/or 15 U.S.C. §14. . **Dr. Sciolaro** voiced opposition to such arrangement as unlawful or at least contrary to sound medical practice. He was in fact interviewed by *Forbes* magazine regarding this issue, and provided "not for public" Congressional testimony regarding the effect of such anticompetitive group purchasing contracts.

38.    **PMC's** level operating room staffing had serious standard of care issues. On numerous times while Dr. Sciolaro was on staff, **Providence** did not even have adequate staffing needed to safely perform a cardiovascular procedure.

39.     **PMC** either endeavored to ignore or cover up these problems, or resisted making improvements to address them

40.     **PMC** became increasingly resentful of **Dr. Sciolaro's** insistence that **PMC** maintain appropriate standards and compliance with contractual and regulatory standards for its operating room and conditions.

### *The Peer Review Process and Bylaw Standards*

41.     **Dr. Sciolaro** has been on Bethany's, Baptist-Lutheran Medical Center and **Providence's** Medical Staff Peer Review Committees from 1998-2006. During the initial several years, **Providence's** incident-based reporting practices generally complied with the standards promulgated by the Joint Commission of Accredited Healthcare Organization (JCAHO), both in identifying patients that met certain criteria for peer review, and in utilizing the standards from the Joint Commission of Accredited Healthcare Organization (JCAHO) for such reviews.

42.     In order to ensure the objectivity of the peer review process, the Joint Commission of Accredited HealthCare Organizations (JCAHO) has promulgated certain quality assurance advisements articulating standards and principals for peer review. Because peer reviewers pass judgment on another healthcare provider's performance, skill, technique and competency, the reviewers should have no prejudice about the cases they are requested to evaluate; this also means they should have no relationship with the patient, case, and no economic motivation to judge the case in a particular manner. The hospital and peer reviews must maintain a high level of objectivity, and conflicts of interest and personal issues must be eliminated.  The method of conducting peer review must be consistent, factual, objective and educational, not derogatory or disciplinarian.

13

The Joint Commission of Accredited HealthCare Organizations (JCAHO) has recommended peer review trigger points during the hospital stay. Hospitals must have well defined peer review trigger points (screening criteria) approved by the medical staff that are applied consistently to all healthcare providers. Decisions made by peer reviewers must be objective, evidence-based clinical decisions grounded on the medical facts involved in the case. The physician be allowed an opportunity for a response if a difficulty exists in patient care. The hospital must have a policy in their bylaws explaining when it is appropriate to engage in an external review for peer review, as necessary after cases have been analyzed through the hospitals internal peer review process. The cases that are sent for external review must be sent without a preconceived bias.

43.     The bylaws of **Providence** included provisions that govern its peer review procedures. Those bylaws included provisions, among other things:

    a.  Precluding participation in the MSRC peer review meetings by any medical staff committee member who has a conflict of interest

    b.  Requiring notice and opportunity for the medical staff member who is subject of the peer review matter, where any K3 or K4 recommendation is proposed, to appear before and present information, including at the MSRC level prior to any recommendation being made to the MEC

    c.  Limiting the availability of precautionary suspensions to only circumstances where failure to take such action may result in immanent danger, and limiting the suspension to only 30 days

14

44.     The standards, principals, and bylaws were part of an express or implied contract and agreement between **Providence** and the physicians who were part of its medical staff, including **Dr. Sciolaro**.

45.     The regulations of the Kansas Board of Healing Arts governing peer review and standard of care determinations establish the following designations or categories:

        a.   K1, standard of care met;

        b.   K2, standard of care not met, but with no reasonable probability of causing injury;

        c.   K3, standard of care not met, with injury occurring or reasonably probable;

        d.   K4, possible grounds for disciplinary action by the appropriate licensing agency.

46.     Under the Kansas Board of Healing Arts regulations, peer review determinations in the K3 or K4 categories are required to be reported to the Kansas Board of Healing Arts.

47.     Certain determinations as to standard of care, or certain unfavorable actions with respect to a physician's privileges, must also be reported to the National Practitioner Data Bank system

48.     The status of a physician's record or status in the National Practitioner Data Bank can, in turn, affect the physicians' eligibility for taking Medicare or Medicaid cases, and health maintenance contracts, which in turn can affect the physician's ability to obtain privileges at a particular hospital or otherwise obtain professional employment.

49.    All of **Dr. Sciolaro's** cases that were reviewed utilizing the Joint

Commission standards for incident-based peer review at **Providence** (i.e., any cases

reviewed prior to October 25, 2006) have been listed as 'K-1 standard of care was met'.

## DEFENDANTS' WRONGFUL AND MALICIOUS CONDUCT
## TOWARD PLAINTIFFS

### *Initial Retaliatory and Predatory Sham Peer Review and*
### *Other Conduct Toward Plaintiffs*

50.    Beginning in late 2006, **PMC**, on information and belief, whether in

reaction to and in retaliation for **Dr. Sciolaro's** opposition to **PMC's** unlawful or poor

quality practices or conditions as alleged above, his endeavors to call attention to and

request the addressing and resolution of **PMC's** numerous problems, or motivated to

divert business from **Plaintiffs** (who had better results and morbidity than the other

surgeon **Defendants**) and enhance **PMC's** revenue through its own **PMC**-controlled

cardiothoracic surgeons and group, including **Dr. Meurer** and others such as **Dr. Rich**,

began a systematic and vigorous plan and scheme to exclude or limit **Dr. Sciolaro** as a

competitor, at least at **PMC**.

51.    In conjunction, the surgeon **Defendants**, including **Dr. Beezley** and **Dr.**

**Meurer**, on information and belief, motivated to divert business from **Plaintiffs** (who

had better results and morbidity than the surgeon **Defendants**) also began a systematic

and vigorous plan and scheme to exclude or limit **Dr. Sciolaro** as a competitor, at least

at **PMC**.

52.    On information and belief, there was an express or implicit agreement,

concert of action or common plan or goal to accomplish such exclusion or limiting of Dr.

**Sciolaro** as a competitor, at least at **PMC**.

53.     These plans and schemes were multi-faceted, and included one or more of the following:

    a.   Causing the submission of fraudulent variance reports or other complaints about **Dr. Sciolaro**;

    b.   Depriving **Dr. Sciolaro** of operating room (OR) staffing, nursing services or other equipment or personnel that **PMC** was obligated to provide in support of **Dr. Sciolaro's** surgery practice;

    c.   Manipulating case result data and statistics and submitting fraudulent or misleading statistics to certain governmental or private reporting agencies, to make **Dr. Sciolaro's** results appear less successful than that of the other surgeon **Defendants**;

    d.   Diverting patients and cases away from **Plaintiffs** and to the other surgeon **Defendants**, including. on information and belief, the use of threats, coercion or intimidation of its own physicians and employees with respect to referrals, including attempts to prohibit persons from making referrals to **Plaintiffs**;

    e.   Excluding or marginalizing other physicians or specialists who referred cases to **Dr. Sciolaro**, or otherwise favor other physicians or specialists who referred cases to the other **Defendants**;

    f.   Initiating and conducting predatory, fraudulent sham peer review cases against **Dr. Sciolaro** to fraudulently justify suspending surgical privileges or otherwise limit or exclude **Dr. Sciolaro** and his practice from competing at **PMC**;

54.     Commensurately, in 2006, the integrity and legitimacy of **PMC's** peer review process began deteriorating. This began with a case in which peer review was prompted by **PMC's** Department of Surgery Operating Room Supervisor maliciously fabricating a variance report relating to a surgical procedure for which she was not even present. After all the factual information was submitted, the Multispecialty Review Committee ("MSRC") agreed the report was groundless and issued a recommend a K-1 standard of care met.

55.     During the peer review process, and in violation of the peer review statutes, the confidentiality of proceedings breached by **PMC's** senior nursing officer when she discussed and disclosed to others the results of the multispecialty peer review proceedings.

56.     On October 11, 2006 **Dr. Beezley**, Chairperson of the MSRC, notified **Dr. Sciolaro** that one of Dr. Sciolaro's cases, #24-78-26, was being reviewed at the MSRC's October 25, 2006 meeting, but that Dr. Sciolaro would be precluded from attending or participating. This was contrary to the peer review procedures and **PMC's** bylaws.

57.     Case #24-78-26 involved a patient who died during a carotid stent procedure performed by another physician. Defendants alleged that **Dr. Sciolaro** should have recommended follow-up procedures following carotid vascular patch repair, contending that the pathology report showed vascular wall infection. The true facts, however, as later shown, and admitted by **PMC** and its own outside reviewer expert, were that **Dr. Sciolaro** *had* recommended follow-up surgery, that the patient had *refused* it, that **PMC's** pathologist had misdiagnosed and misreported about the vascular wall. In addition, it was **PMC's** own inventory of Shelhigh vascular patches that was discovered

18

to have been unsealed or contaminated, a fact that **PMC** attempted to cover up and failed to report to the FDA, in violation of FDA regulations.

58.　　**Providence** used its personnel, including personnel in the "cath lab" that analyzes performance data, to manipulate and falsify statistical result data to fraudulently enhance the apparent performance results data of **PMC's** preferred cardiologists and cardiothoracic surgeons, including **Dr. Meurer** and **Dr. Rich**. **PMC** then submitted such fraudulently manipulated performance data and representations to certain governmental agencies, the College of Cardiology and the Society of Thoracic Surgeons. Personnel who disagreed with or opposed **PMC's** policy of manipulating such data have been forced to leave.

59.　　On October 26, 2006, **Dr. Lindstrom**, President of **PMC's** Medical Staff notified **Dr. Sciolaro** that he was being summarily suspended from his clinical privileges to perform carotid and subclavian bypass and carotid artery repair. This was also contrary to **PMC's** bylaws.

60.　　Also on October 25, 2006, a letter from **Dr. Beezley** notified **Dr. Sciolaro** that the MSRC had recommended a K-4 determination regarding case #24-78-26.

61.　　On November 9, 2006 **Dr. Sciolaro** submitted his written response to **Dr. Beezley's** October 26, 2006 letter, and addressed the care and treatment in case #24-78-26.

62.　　On November 11, 2006 an operating room nurse noted there were broken seals on all of the container jars of Shelhigh brand vascular patches. The operating room nurse notified the operating room materials manager regarding the potentially unsterile products. **Dr. Sciolaro** submitted a letter **Providence's** Medical Staff Office requesting

19

follow up regarding the broken seals discovered on the Shelhigh patch containers. **Dr. Sciolaro** also submitted a report to the FDA. **PMC**, however, failed or refused to either notify Shelhigh or to timely submit a mandatory report to the FDA.

63.     As a result, the inventory of Shelhigh vascular patches at **PMC** came under national scrutiny. **Dr. Sciolaro's** reporting of this problem to the FDA, and PMC's own violation of law in its refusal to make such a mandatory report gave PMC even further motive to retaliate against **Dr. Sciolaro**.

64.     In addition, the fact that the vascular patch involved in case #24-78-26. was from the same supply of Shelhigh patches further undermined any legitimacy of **PMC's** pursuit of peer review in case #24-78-26.

65.     In 2006, **PMC's** employment conditions resulted in the OR scrub nurses and the first assistants quitting, again preventing **Dr. Sciolaro** from providing surgical care to any hospitalized patients, and potentially preventing him from working. The hospital went on diversion until temporary traveling nurses were contracted by hospital.

66.     On November 14, 2006 **Dr. Meurer** in the medical staff office notified **Dr. Sciolaro** regarding the Ad Hoc meeting, and on Wednesday, November 15, 2006 **Dr. Sciolaro** explained to the Ad Hoc members that case #24-78-26 care occurred over several months as an outpatient and the patient had actually declined further surgery after being informed of his serious condition.

67.     November 21, 2006, **Dr. Sciolaro** was notified that **PMC** and its Medical Executive Committee (MEC) was summarily reducing his clinical privileges to preclude him from exercising any vascular surgery privileges he currently held. This was contrary to peer review and bylaws standards.

20

68.    **PMC** attempted to justify the summary suspensions of **Dr. Sciolaro's** privileges ostensibly based on the statistical surgery performance data that **PMC** had itself fraudulently manipulated and altered, and upon the outcome of a single historic case, #24-78-26, the facts about which **PMC** fraudulently represented or concealed, and which **PMC** disingenuously claimed created an emergency that could have been justified only if the patient were still alive and in imminent danger, none of which was true.

69.    On November 22, 2006 **Dr. Sciolaro** was finally provided an opportunity to address the MSRC regarding the care he provided in case #24-78-26.

70.    Dr. Sciolaro submitted copies of his office records on case #24-78-26 to **Providence's** medical staff office, indicating the patient's own decision to decline further procedures Dr Sciolaro had recommended.

71.    **PMC, Dr. Beezley** and/or others of the **Defendants**, however, maliciously and in bad faith provided to **PMC's** external reviewer fraudulently incomplete, manipulated and materially misleading selected excerpts from the medical records, along with a falsified and biased cover letter, to conceal the true facts about the history of the case (including the patient's own informed decision to decline procedures) with the intent of influencing ad inducing the outside review to reach a false opinion as to **Dr. Sciolaro's** standard of care.

72.    In reliance on such incomplete and misleading submissions, the outside reviewer returned to **PMC** an opinion for a K3 determination.

73.    By letter of December 18, 2006, **Dr. Lindstrom** invited **Dr. Sciolaro** to attend the January 17, 2007 MEC meeting.

74.     **Dr. Sciolaro** met with the MEC and he reviewed with the committee members the patient's entire medical records. The outpatient medical records indicated that the patient was given the options of treatment but refused further surgery.

75.     **Defendants** malicioiusly refused to consider actual medical records and charts that demonstrated the falsity of their allegations in the peer review cases, and/or maliciously continued pursuing such cases with actual knowledge of the falsity of the allegations relied upon, all for predatory and/or other illegitimate motives or reasons.

76.     In January 2007, **Dr. Sciolaro** was again forced to delay a surgery due to issues with one of the main sterilizers and the quality of sterile indicators. Again, a variance report had to be submitted by the nurse, and **Dr. Sciolaro** submitted a letter to medical staff office to complain about the condition.

77.     On January 24, 2007 **Dr. Beezley**, now President of **PMC's** Medical Staff and Chairman of the Medical Executive Committee, notified **Dr. Sciolaro** of the determination of "K-3 standard of care not met, with injury occurring or reasonably probable." **Dr. Beezley** also informed Dr. Sciolaro that the case would be reported to the Kansas State Board of Healing Arts.

78.     As expected, **Dr. Sciolaro** ultimately received a letter dated May 9, 2007 from the Kansas Board of Healing Arts.

79.     In addition, as a result of **PMC's** wrongful suspension of **Dr. Sciolaro's** vascular surgery privileges, the National Practitioner Data Bank was notified.

80.     Meanwhile, **Dr. Beezley, Dr. Meurer**, and **PMC** and its agents, also began engaging in efforts to divert patients, cases and referrals to themselves and away from **Plaintiffs**.

22

81.     On information and belief, **PMC** instructed its ER personnel and hospital-based internists-hospitalists to refer patients to other vascular surgeons, namely **Dr. Beezley** and **Dr. Connerly** in **Dr. Beezley's** same practice group, and to refer patients to other cardiothoracic surgeons, namely **Dr. Meurer** and **Dr. Rich** in **Dr. Meurer's** same practice group, instead of referring such patients to **Dr. Sciolaro**.

82.     On information and belief, **PMC** instructed its ER personnel and hospital-based internists-hospitalists to refer patients to **PMC's** own controlled cardiologists and pulmonologists, knowing those cardiologists and pulmonologists would refer patients to other vascular surgeons, namely **Dr. Beezley** and others in **Dr. Beezley's** same practice group (such as **Dr. Connerly**, **Dr. Arnspiger**, and **Dr. Hance**) and to other cardiothoracic surgeons, **Dr. Meurer** and **Dr. Rich** in **Dr. Meurer's** same practice group, instead of **Dr. Sciolaro**.

83.     Meanwhile, **PMC** and one or more of the other **Defendants** began pursuing, in furtherance of their schemes, efforts to harass and marginalize, including by way of actual or threatened sham peer review cases, cardiologists and other physicians who referred surgery cases to **Plaintiffs**.

84.     **Plaintiffs'** referrals and revenue from began to suffer as a result of Defendants' wrongful actions.

85.     With cardiothoracic surgery being diverted away from **Dr. Sciolaro** and toward the surgeon **Defendants**, what was once a strong cardiothoracic surgery program at **PMC** began sliding into a marginal program with higher morbidity and mortality rates than in the past.

86.     **PMC** continued to breach its contractual obligations to provide OR staffing for **Dr. Sciolaro**. There were numerous occasions when **Dr. Sciolaro** was not even provided adequate staffing to safely perform a cardiovascular procedure. Finally, in March 2007, while **Dr. Sciolaro** was on emergency room call, **Providence** failed to have a nurse on call to scrub an emergency cardiovascular procedure. Due to **PMC's** repeated egregious breach of contract, and consummate threat to patient care and safety, **Dr. Sciolaro** had no choice in the interest of patient safety but to resign his cardiovascular and thoracic privileges.

87.     In preparation for a June 12, 2007 Fair Hearing, numerous experts submitted reports supporting **Dr. Sciolaro's** decision-making and surgical care for his patient.  Inter alia, these reports indicated not only **that Dr. Sciolaro** had appropriately consulted with and advised the patient, but that PMC's other criticism was based on its own pathologists' misdiagnosis of the tissue specimen at issue.

88.     Moreover, **PMC's** own external reviewer, and only expert witness, upon learning of the incomplete and misleading records provided by **Dr. Beezley** and **PMC**, *reversed* his standard of care designation from a K3 below-the-standard-of-care finding to a K1 standard-of-care-met finding based upon reviewing the entire medical records.

89.     Notwithstanding that **Defendants** had intentionally misled **PMC's** outside reviewer, and that **PMC's** only expert witness now agreed that there was no reportable departure from the standard of care, **PMC**, **Dr. Beezley** and perhaps other of the **Defendants**, nevertheless maliciously insisted on pursuing the effort to pursue the case as a K3 incident, without any evidence of such conduct.

90.     Moreover, **PMC** communicated and made it clear that, even if **Dr. Sciolaro** prevailed, **PMC** and **Dr. Beezley** were intent on excluding **Dr. Sciolaro** from practicing and competing at **PMC**, and that **Defendants** intended to vigorously continue, at any cost and by whatever means necessary, their campaign to exclude him from practicing and competing at **PMC**

91.     The only alternative that **PMC** would consider was a Confidentiality and Settlement Agreement to resolve the matter by **PMC** withdrawing the standard of care review matter in case #24-78-26, in exchange for **Dr. Sciolaro** agreeing to resign his medical staff position at **PMC** and granting a release to **PMC** for any claims arising from **PMC's** conduct to date.

92.     In light of the **Defendants'** stated resolve to continue pursuing him with malicious actions to exclude him as a competitor at **PMC** if he attempted to remain there, **Dr. Sciolaro** was left with little choice but to resign from **PMC** medical staff, so that he could continue his career elsewhere.

93.     Due to the circumstances maliciously devised and orchestrated by **Defendants**, however, **Dr. Sciolaro** could not reasonably consider resigning from the **PMC** medical staff until his vascular surgery privileges were restored, due to implications (even though maliciously and falsely created) such resignation would have had on his credentials.

94.     **Dr. Sciolaro** was willing to execute the Confidentiality and Settlement Agreement, because it was the only apparent method by which he could escape the poisonous atmosphere created by **Defendants**, and to prevent further targeting and maligning of his skills and reputation by **Defendants**, so that he could continue his

practice elsewhere, away from the malicious, predatory, anticompetitive and vitriolic atmosphere created by **Defendants** at **PMC**.

95.     Accordingly, under severe duress, **Dr. Sciolaro** was forced to consent to the agreement. On June 12, 2007, the date of the scheduled Fair Hearing, **PMC** and **Dr. Sciolaro** entered into such a Confidentiality and Settlement Agreement.

96.     By the concerted action alleged herein, **Defendants** intended to, and did, succeed in excluding **Dr. Sciolaro** as a competitor at **PMC**, including by way of inducing **Dr. Sciolaro** into signing the June 12, 2007 Confidentiality and Settlement Agreement.

97.     **Dr. Sciolaro** executed the Confidentiality and Settlement Agreement in good faith reliance upon the representations and covenants expressed by PMC in the Agreement.

98.     On June 14, 2007 **Dr. Sciolaro** voluntarily resigned from the medical staff at PMC, in good faith compliance with the June 12, 2007 Confidentiality and Settlement Agreement.

### *Subsequent Retaliatory and Predatory Sham Peer Review, Anticompetitive Conduct, Breach of Contract, Tortious and Malicious  and Other Conduct Toward Plaintiffs*

99.     **Defendants'** success in excluding **Dr. Sciolaro** from practicing and competing at **PMC** was not sufficient to satisfy **Defendants'** desire to harm **Plaintiffs**, however.

100.    **PMC** has subsequently breached material covenants and obligations of the June 12, 2007 Confidentiality and Settlement Agreement.

101.    Moreover, **PMC's** and **Defendants'** conduct has evidenced that at the time the June 12, 2007 Confidentiality and Settlement Agreement was executed,

**Defendants** did not have the present intent to honor the terms of that agreement, and accordingly that they fraudulently induced **Dr. Sciolaro** into entering that agreement.

102. In addition, **Defendants** have engaged in a pattern of malicious, tortious, anticompetitive conduct subsequent to the June 12, 2007 Confidentiality and Settlement Agreement.

103. For these reasons, **Defendants** are not entitled to the benefit of the release contained in the June 12, 2007 Confidentiality and Settlement Agreement.

104. Since **Dr. Sciolaro's** resignation from the medical staff at **PMC**, as a result of **Defendants** accomplishing their scheme to eliminate him as competitor at **PMC**, **Defendants** have now nevertheless embarked upon, and are still engaged in, a malicious, relentless and obsessive quest to completely eliminate **Dr. Sciolaro** as a competitor in any manner.

105. On information and belief, there is an express or implicit agreement, concert of action or common plan or goal to accomplish such exclusion or limiting of **Dr. Sciolaro** as a competitor, and to maliciously damage **Plaintiffs'** business and practice of surgery and medicine generally.

106. These plans and schemes are multi-faceted, and include one or more of the following:

    a. Manipulating case result data and statistics and submitting fraudulent or misleading statistics to certain governmental or private reporting agencies, to make **Dr. Sciolaro's** results appear less successful than that of the other surgeon **Defendants**;

b.  Diverting patients and cases away from **Plaintiffs** and to the other
    surgeon Defendants;

c.  Disparagement of **Plaintiff, Plainitff's** reputation and medical
    practice;

d.  Excluding or marginalizing other physicians or specialists who
    referred cases to **Dr. Sciolaro**, or otherwise favor other physicians or
    specialists who referred cases to the other **Defendants**;

e.  Initiating and pursuing additional bad faith, predatory, fraudulent sham
    peer review cases against **Dr. Sciolaro**, to attempt to fraudulently
    cause the reporting of disparaging data to the National Practitioner
    Data Bank, to fraudulently cause the reporting of cases to the Kansas
    Board of Healing Arts, to attempt to maliciously procure disciplinary
    action against **Dr. Sciolaro's** medical license, and to otherwise
    maliciously interfere with **Plaintiffs''** existing and prospective
    business.

f.  Fraudulently manipulating, misrepresenting or concealing medical
    records in order to make such peer review cases appear meritorious,
    when the true facts and complete correct medical records demonstrate
    no grounds for challenging **Dr. Sciolaro's** standard of care;

g.  Wrongfully depriving **Dr Sciolaro** of due process, including attending
    or participating in any presentation of facts before the MSRC relating
    to the bad faith, predatory, fraudulent sham peer review cases initiated

against him, and otherwise depriving him of appropriate procedural rights;

h.  Improperly using or disclosing the existence of confidential peer review matters to others, including the medical community or others, outside any peer review proceedings, including implying that the peer review matter had merit, under circumstances where **Defendants** knew such implications and the underlying bases for the peer review matters were false, for the improper purpose of interfering with **Plaintiffs'** business relationships or disparaging **Plaintiffs**;

i.  Improperly communicating, disseminating or implying to others, outside any peer review proceedings, suggestions of problems with **Dr. Sciolaro's** professional quality of care, which **Defendants** knew were false, for the improper purpose of interfering with **Plaintiffs'** business relationships or disparaging **Plaintiffs.**

107.  Subsequent to the June 12, 2007 Confidentiality and Settlement Agreement, **Defendants** have continued, in bad faith and maliciously, pursuit of additional predatory, fraudulent sham peer review cases against **Dr. Sciolaro.**

108.  By letter of June 20, 2007 **Dr. Beezley**, informed **Dr. Sciolaro** that the MSRC had forwarded to the MEC a K-3 below-the-standard-of-care determination on case #11-08-81. The MEC meeting on that matter was postponed until August 8, 2007.

109.  Case #11-08-81 involved a complication from an orthopedic procedure. The patient's family was informed and directed the patient's care. **PMC** blamed **Dr. Sciolaro** for not performing a fasciotomy procedure, even though **Dr. Sciolaro** does not

perform fasciotomy procedures, and the procedure was performed by the orthopedic surgeon.

110.    On July 17, 2007 **Dr. Beezley** informed **Dr. Sciolaro** of an MSRC recommendation of K3 below-the-standard-of-care determination on cases #35-57-16, #38-74-65, and # 36-17-39, and that the MEC had upheld these three K3 recommendations.

111.    Case # 35-57-16 was an operation in which **Providence's** own operating room failed to have the appropriate size and length of a carotid shunt to safely perform the carotid endarectomy operation.

112.    Case #38-74-65 involved a successful operation, three months after which the patient developed an outpatient infection.

113.    Case # 36-17-39 had already previously been peer reviewed by **PMC's** MSRC, and the MEC had previously upheld the recommendation and outcome as a K-1 standard-of-care-met determination. There was no legitimate reason for this case being reviewed again and for a previous K1 determination being changed to a K3 below-the-standard-of-care determination. Moreover, this case was capriciously and in bad faith set the case to an external reviewer, altering the records with inferences of an abnormal radiological procedure and then was in bad faith ultimately submitted to the Kansas State Board of Healing Arts.

114.    By letter dated August 13, 2007 **Dr. Beezley** informed **Dr. Sciolaro** that the MSRC had referred two other cases: #02-83-28 and #28-75-30.

115.    Case #02-83-28 involved the patient's own informed election to use Cryopreserved saphenous vein versus utilizing her remaining marginal saphenous vein.

The patient's decision was made as an outpatient. **Dr. Sciolaro** submitted her outpatient records and he appeared before the MEC committee to answer their questions on October 10, 2007.

116.    Case #28-75-30 involved an intestinal complication that developed two weeks after the patient's original vascular operation.

117.    Although **Dr. Beezley's** August 13, 2007 letter indicates that an outside review was utilized, the outside review occurred prior to **Providence's** peer review process, contrary to **PMC's** bylaws and/or established protocols. In addition, **PMC** withheld any outpatient records from the outside reviewer, and **PMC** did not utilize the patient's outpatient records in making a peer review determination for these cases.

118.    By letter dated September 19, 2007, **Dr. Beezley's** reported that the MSRC had referred two additional cases to the MEC as K3 below-the-standard-of-care recommendations: case #17-50-72 and case #24-89-43.

119.    Case #17-50-72 involved the choice of vascular conduit where the patient had a hypercoagulable condition and a history of a deep venous thrombosis. **Dr. Sciolaro** happens to be an expert in Phlegmasia Cerulea Dolens and had authored peer reviewed literature, all of which established compliance with the appropriate standard of care for this patient.

120.    Case #24-89-43 involved a thigh wound infection. Upon presentation of additional information that PMC had withheld from the external reviewer and the MSRC, the MEC ultimately decided to change the recommendation to a determination that the standard of care had been met.

121.    **PMC** and **Defendants**, including by and through **Dr. Williams,** wrongfully denied **Dr. Sciolaro** any opportunity to address the MSRC on any of these cases, even though **Dr. Sciolaro** made know his desire and request to do so, and even though the bylaws and June 12, 2007 Confidentiality and Settlement Agreement required such opportunity to be granted.

122.    During the MEC meeting on October 10, 2007, **Dr. Sciolaro** appeared before the MEC to answer questions. **Dr. Sciolaro** read his letter of October 10, 2007, describing his concerns with predatory and bad faith peer review process and other issues at **PMC**. **Dr. Sciolaro** reminded the MEC that, in violation of the bylaws and contract rights, he had been deprived of the right to defend his patient care management before a peer review committee. **Dr. Sciolaro** also reminded the MEC that an external review had been allowed despite having adequate cardiovascular peers on staff at **Providence, and** that, contrary to **PMC's** bylaws, the outside review had occurred prior to **Providence's** peer review process. **Dr. Sciolaro** also objected that **PMC** had hastened to complete the peer review without including or providing to the reviewer all of the facts, including the outpatient charts.

123.    **Defendants** malicioiusly refused to consider actual medical records and charts that demonstrated the falsity of their allegations in the peer review cases, and/or maliciously continued pursuing such cases with actual knowledge of the falsity of the allegations relied upon, all for predatory and/or other illegitimate motives or reasons.

124.    Notwithstanding the breach of contract by **PMC**, and the improprieties and bad faith of **PMC**, its MSRC and MEC, and the **Defendants**, especially **Dr. Beezley,** the MEC proceeded to submit these additional cases to the Kansas Board of Healing Arts,

and Dr. Sciolaro has had to answer and respond to the Kansas Board of Healing Arts regarding these patient cases that were submitted because of Defendants' bad faith submission of a K-3 below-the-standard-of-care determination.

125.   *Inter alia*, **PMC's** purported determinations and submission of such cases to the Kansas Board of Healing Arts was a breach of the bylaws and of **Providence's** contract with **Plaintiffs**, including the express or implied contract created by the bylaws, and including the June 12, 2007 Confidentiality and Settlement Agreement, including the requirement guarantying participation by **Dr. Sciolaro** just as if on he were still a member of **PMC's** medical staff.

126.   **Defendants'** pursuit of such peer review proceedings were in bad faith and malicious.

127.   **Defendant's** submission of facts upon which such peer review actions were premised were false and fraudulent, including the intentional manipulation, omission or concealment of material facts to the outside reviewer, and to the Kansas Board of Healing Arts.

128.   Such peer review actions were not done for legitimate purposes, but in bad faith, for malicious, predatory purposes, after **Dr. Sciolaro** had already resigned his privileges at **Providence**, was no longer on staff, and was no longer a peer at such facility.

129.   Contrary to the good faith requirements of the Health Care Quality Improvement Act of 1986, and of K.S.A. §65-4909, **PMC** engaged in the systematic practice of permitting competitors to review charts for improper, bad faith and predatory purposes, including for the improper financial self-interest of **PMC** and the other

**Defendants**, and with the malicious intent to harm **Plaintiff**, and **Defendants** took their actions in bad faith, maliciously, and for their own pecuniary interest, without reasonable belief that the actions would further quality healthcare, without a reasonable effort to obtain the facts of the matters, without affording adequate notice and hearing procedures to **Dr. Sciolaro**, and/or without the reasonable belief that the actions were warranted by the facts known after such reasonable effort to obtain facts and after meeting procedural requirements. In addition, the actions of **Defendants** alleged herein are actions taken outside the legitimate scope of peer review or risk management activity. Therefore, **Defendants'** actions are not entitled to immunity under the Federal Health Care Quality Improvement Act of 1986 ("HCQI Act"), 42 U.S.C.A., § 1111, *et. seq.*, Health Care Quality Improvement Act or under the provisions of K.S.A. §65-4909, §65-4929, or otherwise.

130.    **Dr. Beezley**, a competing peripheral vascular surgeon, and later also **Dr. Meurer**, a competing cardiothoracic surgeon, were unlawfully and maliciously, with the assistance of PMC, given full control over the peer review process. The competing surgeons were allowed to review Dr. Sciolaro's hospital records, and then a set of misleading and incomplete medical records would be sent out for an outside review. For each set of these records, Providence would send a biased cover letter.

131.    The malice and bad faith of **Defendants'** pursuit of peer review cases against **Dr. Sciolaro** is also evidenced by the double standard utilized for selecting such cases, vis-à-vis cases involving other surgeons at **PMC** who have not been subjected to peer for such results as: postoperative deaths, return to the operating room, postoperative strokes, a cardiovascular surgeon leaving the operating room and leaving the hospital

34

while his patient was unstable.  Moreover, in an effort to cover up **PMC's** malicious and fraudulent selection of cases against Dr. Sciolaro, nurses who mention these concerns to their superiors are asked by **PMC** to leave or be forced to be silent.

132.    In addition, most of the cases under review occurred outside **Providence's** legitimate "hospital's incident reporting time," involving care over several months as an outpatient.

133.    **Defendants** have in bad faith, and in violation of procedural requirements, prevented **Dr. Sciolaro** from pleading his case at the Multispecialty Peer Review Committee level.

134.    The fundamental fairness of the process has further been compromised before the MEC because it was chaired by **Dr. Beezley**, a competing vascular surgeon with a conflict of interest who utilized the fraudulently induced reports of outside reviewers to influence the committee members.

135.    Finally, the fundamental fairness of the proceedings before the Kansas Board of Healing Arts has been interfered with by reason of **Dr. Beezley's** conflict of interest and breach of ethics as a member of the Board having had improper ex parte communications with the Board regarding cases involving **Dr. Sciolaro** before any cases were even submitted to the Board, or while they were in the process of being submitted or considered by the Board.

136.    **Defendants'** practices are not only not in good faith, but have been continually tainted by manipulation of the medical records provided to outside reviewers in order to distort and misrepresent or conceal material facts. Such practice did not comport with due process, was predatory in nature and purpose, undertaken in bad faith,

constituted an abuse of the peer review process, and is not protected or privileged under law.

137.     In addition, **Dr. Beezley's** ex parte and improper sharing of **PMC** peer review matters with Kansas Board of Healing Arts, of which he was/is a member, while also serving on the **PMC** MSRC or MEC, and while being a direct competitor of **Dr. Sciolaro,** constitutes egregious interference with quasi judicial process, if not an outright violation of Kansas public ethics and conflict of interest laws.

138.     The actions of **PMC,** and the competing surgeons **Defendants,** were taken for their own personal and financial interests, not in good faith pursuit of legitimate peer review purposes.

139.     **Defendants** have abused the peer review process for their own economic gain and to cause the ruin and damage to the professional surgical career and of **Dr. Sciolaro,** thereby amounting to a "sham peer review".

140.     Defendants have acted with the malicious intent and purpose of causing misrepresentations and misleading information to be placed into National Practitioner Data Bank, with the intended attendant impact and interference with **Dr. Sciolaro's** ability to practice by reason of impairing accessibility to Medicare or Medicaid patients or HMO contracts.

141.     On information and belief, **PMC** and one or more of the other **Defendants** have also engaged in continued attempts to manipulate and fraudulently report surgical results data to certain governmental agencies, the College of Cardiology and the Society of Thoracic Surgeons governmental agencies, in a manner that misrepresents and fraudulently enhances the apparent performance results data of **PMC's** preferred

cardiologists and cardiothoracic surgeons, including **Dr. Beezley**, **Dr. Meurer** and **Dr. Rich**, vis-à-vis **Dr. Sciolaro**.

142.    **Dr. Sciolaro's** morbidity and mortality is in fact better than the competing **Defendants**. Morbidity data has been skewed because **Dr. Sciolaro** is a solo provider; when a complication occurs with the **Defendant** surgeons, their partners will do the surgery, and so if a complication requires return to the OR, it is not one reflected in the data reported as one attributable to the surgeon in question if a partner handles the complication.  The reported data that is submitted to Medicare and JCAHO is therefore suspect.  The data is changed to enhance performance quality data for certain groups, while other groups the data are altered to worsen their quality indicators.

143.    **Dr. Beezley**, **Dr. Meurer**, and **PMC** and its agents, have also continued efforts to divert patients, cases and referrals to themselves and away from **Plaintiffs**.

144.    On information and belief, **PMC** has continued to instruct its ER personnel and hospital-based internists-hospitalists to refer patients to other vascular surgeons, namely **Dr. Beezley** and **Dr. Connerly** in **Dr. Beezley's** same practice group, and to refer patients to other cardiothoracic surgeons, namely **Dr. Meurer** and **Dr. Rich** in **Dr. Meurer's** same practice group, instead of referring such patients to **Dr. Sciolaro**, even where such patients were already patients of **Dr. Sciolaro**.

145.    On information and belief, **PMC** has instructed its ER personnel and hospital-based internists-hospitalists to refer patients to **PMC's** own controlled cardiologists and pulmonologists, knowing those cardiologists and pulmonologists would refer patients to other vascular surgeons, namely **Dr. Beezley** and **Dr. Connerly** in **Dr. Beezley's** same practice group, and to other cardiothoracic surgeons **Dr. Meurer** and **Dr.**

**Rich**, instead of **Dr. Sciolaro**, even where such patients were already patients of **Dr. Sciolaro**.

146.    More significantly, on information and belief, **PMC**, and one or more of the other **Defendants** or their agents, have turned away existing or prospective patients of **Plaintiffs** by falsely representing that **Dr. Sciolaro** no longer had an office **at Providence**, had left over quality issues, had left the area, or even that **Dr. Sciolaro** was no longer in practice in the area.

147.    **Defendants** have further interfered with referrals, or induced other physicians from referring cases and patients to Plaintiffs, by wrongful means including wrongful and unlawful disclosure of peer review case matters or determinations, or making false representations or implications about **Dr. Sciolaro's** quality of care.

148.    **PMC**, and its MEC, MSRC, the Ad Hoc committee and members of such committees failed to obtain, or ignored, the complete medical records needed for making a determination, as many of the peer review cases brought against Dr. Charles Sciolaro required outpatient medical records.

149.    **PMC**, its MEC, MSRC, the Ad Hoc committee, and the members of those committees failed to protect the confidentiality of the peer review proceedings and **Dr. Sciolaro's** career has suffered defamation, false light publicity as a result.

150.    **Defendants** failed to follow JCAHO protocol for external review of confidential hospital medical records, and contrary to protocols and procedural requirements:

      a.    Sent biased cover letters to the external reviewers;

b.      Sent incomplete hospital medical records and radiological records including x-rays to external reviewers;

c.      Failed to send outpatient medical records to the external reviewers;

d.      Failed to respond to the external reviewers' requests for all medical records and x rays;

e.      Failed to apprise reviewers on the peer review process regarding the incomplete medical records

151.    **PMC**, its MEC, MSRC, the Ad Hoc committee, and the members of those committees failed to protect the confidentiality of the peer review proceedings and **Dr. Sciolaro's** career has suffered defamation, false light publicity as a result.

152.    **PMC**, its MEC, MSRC, the Ad Hoc committee, and the chairpersons of those committees failed to give adequate and specific notice of complaints against **Dr. Sciolaro**.

153.    **PMC**, its MEC, MSRC, the Ad Hoc committee, and the chairpersons of those committees failed to give **Dr. Sciolaro** notice of certain ongoing peer review investigations.

154.    **PMC**, its MEC, MSRC, the Ad Hoc committee, and the chairpersons of those committees failed to timely allow cross-examination and right to question and point out errors, inconsistencies, and inaccuracies of the witnesses and any expert witness against **Dr. Sciolaro.**

155.    On information and belief, **PMC**, its MSRC, and MEC and the chairpersons of those committees improperly and in bad faith sent for external review all

39

of **Dr. Sciolaro's** peripheral vascular surgery cases from 2004-2006 without first going

through **PMC's** peer review process.  Then Defendants used the external reviewer's

comments to influence the peer review process of the MSRC and MEC after **Dr. Sciolaro**

had already resigned from **PMC's** Medical Staff. No other physician's records or cases

were pulled for review, however. (This notwithstanding some very poor results and

clearly substandard care exhibited in other cases by the other **PMC** surgeons, including

one or more of the surgeon **Defendants**, and notwithstanding that **Dr. Sciolaro** has never

had any adverse standard of care determinations on any of his cases at any of the other

facilities and regions where he has operated.) On information and belief, no other

physician or surgeon at **PMC** has ever been subjected to such extraordinary scrutiny. **Dr.
Sciolaro** has outrightly been singled out and targeted for no reason but for malicious,

predatory, and improper purposes.

156.   **PMC**, its MEC, MSRC, the Ad Hoc Committee, and the chairpersons of

those committees violated and breeched the **Providence's** Medical staff bylaws by reason

of obvious conflict of interests between the committee chairpersons and **Dr. Sciolaro**.

157.   Many of the wrongful actions of **Defendants** were committed outside the

scope of any peer review proceedings or process.

158.   On information and belief, **Defendants** improperly used or disclosed or

suggested to others, including the medical community or others, outside any peer review

proceedings, the existence of confidential peer review matters. On information and belief,

**Defendants** did so to imply that the peer review matters had merit, under circumstances

where **Defendants** knew such implications and the underlying bases for the peer review

matters were false, for the improper purpose of interfering with **Plaintiffs'** business relationships or disparaging **Plaintiffs**;

159.    On information and belief, **Defendants** improperly communicated, disseminated or implied to others, outside any peer review proceedings, suggestions of problems with **Dr. Sciolaro's** professional quality of care, which **Defendants** knew were false, for the improper purpose of interfering with **Plaintiffs'** business relationships or disparaging **Plaintiffs.**

160.    On information and belief, Defendants have engaged in these plans and schemes, and have undertaken these actions in reaction to and in retaliation for **Dr. Sciolaro's** opposition to **PMC's** unlawful or poor quality practices or conditions as alleged above, his endeavors to call attention to and request the addressing and resolution of **PMC's** numerous problems, or motivated to divert business from **Plaintiffs** (who had better results and morbidity than the other surgeon **Defendants**) and enhance **PMC's** revenue through its own **PMC**-controlled cardiothoracic surgeons and group, including **Dr. Meurer** and others such as **Dr. Rich**, began a systematic and vigorous plan and scheme to exclude or limit **Dr. Sciolaro** as a competitor, at least at **PMC**, and in an effort to divert attention from, or discredit Dr. Sciolaro's efforts to address, **PMC's** own problems with quality or conditions.

161.    **Defendants** took or directed actions against **Plaintiffs**, and/or had and exercised influence, coercion over the process of the actions take against **Plaintiffs**.

162.    **Defendants'** wrongful actions as outlined above are not privileged, protected or immune under either the Health Care Quality Improvement Act of 1986, under the Kansas peer review statutes, or otherwise.

163.   **Defendants'** actions were taken in bad faith, maliciously, and for their own pecuniary interest, were not taken with the reasonable belief that the actions would further quality healthcare, were not taken after a reasonable effort to obtain the facts of the matters, were not taken after affording adequate notice and hearing procedures to **Dr. Sciolaro**, and were not taken in the reasonable belief that the actions were warranted by the facts known after such reasonable effort to obtain facts and after meeting procedural requirements. In addition, the actions of **Defendants** alleged herein are actions taken outside the legitimate scope of peer review or risk management activity. Therefore, **Defendants'** actions are not entitled to immunity under the Federal Health Care Quality Improvement Act of 1986 ("HCQI Act"), 42 U.S.C.A., § 1111, *et. seq.,* Health Care Quality Improvement Act or under the provisions of K.S.A. §65-4909, §65-4929, or otherwise.

164.   **Defendants'** actions were in breach of **PMC's** covenants and the terms of the June 12, 2007 Confidentiality and Settlement Agreement, therefore not entitled to rely on any release contained in such agreement.

165.   As a result of **Defendant's** wrongful actions, **Plaintiffs** have been deprived of surgery and consultation referrals.

166.   **Defendant's** wrongful actions have also caused **Dr. Sciolaro** to be denied surgery privileges at other hospitals.

167.   As a result of **Defendant's** wrongful actions, **Plaintiffs** have been damaged, and will in the future continue to be damaged, in amounts yet to be determined, including, but not limited to lost profits to date and lost profits in the future..

168.   **Defendant's** intentional and malicious wrongful actions have caused severe emotional distress and mental anguish to **Dr. Sciolaro**.

169.   **Defendant's** intentional and malicious wrongful actions have caused damage to **Dr. Sciolaro**, his wife and family, including the loss or diminution in his ability to provide services to his wife and family.

170.   **Defendant's** intentional and malicious actions in derogation of **Plaintiff's** rights entitle **Plaintiff's** to an award of punitive or exemplary damages.

## COUNT I – FEDERAL ANTITRUST VIOLATIONS

171.   For their first cause of action against **Defendants, Plaintiffs** hereby incorporate by reference the above allegations contained above as through fully set forth herein.

172.   **Defendants** are engaged in "commerce" within the meaning of 15 U.S.C. §§1 et seq., including by reason of having business, patients, contracts, insurance arrangements by and between Defendants and persons in other states, and Medicare or Medicaid arrangements and HMO agreements or transactions.

173.   **Defendants'** actions, all as alleged above, constitute a combination or conspiracy in restraint of trade, in violation of 15 U.S.C. §1.

174.   **Defendants** have, among other things, engaged in concerted action to eliminate **Plaintiffs** as a competitor at **PMC**, and also to eliminate **Plaintiffs** as a competitor in the market generally, including by reason of maliciously and wrongfully initiating or pursuing predatory and fraudulent, sham peer review actions against **Dr. Sciolaro**, manipulating and misrepresenting records, using such sham peer review actions and manipulated records to ostensibly justify summary suspension of privileges, the use

43

and threats of continued malicious actions to coerce **Dr. Sciolaro** into resigning from **PMC's** medical staff, maliciously using sham peer review actions as a cloak of immunity for damaging **Plaintiffs'** business and practice while breaching confidentially requirements of the peer review process in order to disparage **Plaintiffs''** business and reputation in the medical community, and maliciously and in bad faith submitting cases to the Kansas Board of Healing Arts with the intent and purpose of procuring licensure actions against **Dr. Sciolaro** on fraudulent grounds.

175.    **Defendants'** actions further amount to an unlawful group boycott or attempted group boycott of **Plaintiffs**, including by reason of wrongful and improper actions of manipulating and misrepresenting records, initiating and pursuing fraudulent sham peer review actions against **Dr. Sciolaro**, leaking confidential information about such peer review process, then using the fraudulent suspension of **Dr. Sciolaro's** privileges along with the information leaked about the peer review cases to divert other physicians from dealing with or making referrals to **Plaintiffs**, and causing or requiring hospital-based internist-hospitalists to refer patients to **Dr. Beezley, Dr. Connerly, Dr. Meurer** and **Dr. Rich**, and not to **Plaintiff**, and then also pursuing or threatening to pursue peer review or other taking other actions to exclude from **PMC** or otherwise intimidate other physicians who referred to **Plaintiff.**

176.    **Defendants'** actions were intended, and had the tendency, to unreasonably and substantially lessen competition in the relevant market.

177.    **Defendants'** actions in restraint of trade are unreasonable, or are *per se* violations of the antitrust laws.

178.    By reason of **Defendants'** actions, Plaintiffs have been substantially damaged, and will continue to be substantially damaged in the future, in amounts yet to be determined.

179.    Pursuant to 15 U.S.C. §24, **PMC's** antitrust violations also constitute the violations of the individual **Defendants**, as agents of **PMC**, its MSRC, MEC or Ad Hoc committees who have authorized, ordered to committed the acts constituting, in whole or in part such violations.

180.    Pursuant to 15 U.S.C. §15, **Plaintiffs** are entitled to an award of treble damages, together with an award of costs and attorneys fees.

181.    Pursuant to 15 U.S.C. §26, Plaintiffs are also entitled to injunctive relief against continued threatened injury, together with an award of costs and attorneys fees.

## COUNT II – STATE ANTITRUST VIOLATIONS

182.    For their second cause of action against **Defendants, Plaintiffs** hereby incorporate by reference the above allegations contained above as through fully set forth herein.

183.    **Defendants'** actions, all as alleged above, constitute a combination or agreement in restraint of trade, in violation of K.S.A. §50-101 and §50-102.

184.    **Defendants** have, among other things, engaged in an agreement or combined action to eliminate **Plaintiffs** as a competitor at **PMC**, and also to eliminate **Plaintiffs** as a competitor in the market generally, including by reason of maliciously and wrongfully initiating or pursuing predatory and fraudulent, sham peer review actions against **Dr. Sciolaro**, manipulating and misrepresenting records, using such sham peer review actions and manipulated records to ostensibly justify summary suspension of

45

privileges, the use and threats of continued malicious actions to coerce **Dr. Sciolaro** into resigning from **PMC's** medical staff, maliciously using sham peer review actions as a cloak of immunity for damaging **Plaintiffs'** business and practice while breaching confidentially requirements of the peer review process in order to disparage **Plaintiffs''** business and reputation in the medical community, and maliciously and in bad faith submitting cases to the Kansas Board of Healing Arts with the intent and purpose of procuring licensure actions against **Dr. Sciolaro** on fraudulent grounds.

185.     **Defendants'** actions were intended, and had the tendency, to unreasonably restrict or prevent the full and free pursuit of business, including the business of **Plaintiffs**.

186.     **Defendants'** actions were without legal justification or excuse.

187.     Pursuant to K.S.A. §50-102, the individual **Defendants'** participation in any such agreement or combination, directly or indirectly, whether on behalf of themselves, or as agents, principals, representatives or otherwise of **PMC**, its MSRC, MEC or Ad Hoc committees, was prohibited.

188.     By reason of **Defendants'** actions, Plaintiffs have been substantially damaged, and will continue to be substantially damaged in the future, in amounts yet to be determined.

189.     Pursuant to K.S.A. §50-108, **Plaintiffs** are entitled to an award of damages sustained, together with an award of costs and attorneys fees.

## COUNT III – COMMON LAW UNFAIR COMPETITION

190.     For their third cause of action against **Defendants, Plaintiffs** hereby incorporate by reference the above allegations contained above as through fully set forth herein.

191.     In addition or in the alternative, **Defendants'** actions, all as alleged above, constitute tortious and unfair competition, as unreasonable restraint of trade.

192.     **Defendants** have, among other things, engaged in an agreement or combined action to eliminate **Plaintiffs** as a competitor at **PMC**, and also to eliminate **Plaintiffs** as a competitor in the market generally, including by the improper means alleged above, for improper purposes and not for legitimate business purposes.

193.     **Defendants'** actions were intended, and had the tendency, to unreasonably restrict or prevent the full and free pursuit of business, including the business of **Plaintiffs**.

194.     **Defendants'** actions were without legal justification or excuse.

195.     By reason of **Defendants'** actions, Plaintiffs have been substantially damages, and will continue to be substantially damaged in the future, in amounts yet to be determined.

## COUNT IV – TORTIOUS INTERFERENCE
## WITH EXISTING OR PROSPECTIVE BUSINESS OR RELATIONSHIPS

196.     For their fourth cause of action against **Defendants, Plaintiffs** hereby incorporate by reference the above allegations contained above as through fully set forth herein.

197.   **Plaintiffs** had numerous existing business relationships, as well as the

expectancy of numerous business relationships, with the probability of future economic

benefit to the **Plaintiffs**. Such existing or prospective relationships included multitudes of

patient relationships, both existing and prospective, as well as relationships with

numerous physicians, including cardiologists and other specialists, and general

practitioners, all of whom referred patients to **Plaintiffs**, and access to Medicare or

Medicaid patients, or to HMO contracts and patients.

198.   **Defendants** had knowledge of such relationships or expectancies.

199.   But for the conduct of **Defendants, Plaintiffs** were reasonably certain to

have continued such relationships and to have realized such expectancies.

200.   The actions of **Defendants**, including the conduct and improper means all

as alleged above, constituted intentional misconduct by **Defendants**, which misconduct

was without legal justification or excuse. Such misconduct includes, but is not limited to:

manipulating or misrepresenting records, wrongfully suspending Dr. Sciolaro's

privileges, making false and misleading disclosures that **Dr. Sciolaro's** privileges had

been suspended while concealing the fact that such privileges had bee reinstated once

complete records were considered, initiating and pursuing fraudulent and predatory sham

review cases and submitting such cases to the Kansas Board of Healing Arts, while

manipulating or misrepresenting records or withholding material records,  with the intent

or design to fraudulently cause licensure action against Dr. Sciolaro and/or National

Practitioner Data Bank reporting that would impact his ability to practice medicine,

making false or misleading disclosures (including improper disclosure of confidential

peer review matters) disparaging to **Dr. Sciolaro**, including the existence of peer review

matters without also disclosing that such peer review cases were based on fraudulent and materially incomplete records, making improper and unlawful ex parte contact with the Kansas Board of Healing Arts, and the actual or threatened wrongful initiation or pursuit of sham peer review actions against other physicians who referred patients to **Dr. Sciolaro**, falsely informing potential patients that **Dr. Sciolaro** is no longer practicing in the area, or that he is no longer practicing at all. Such misconduct was malicious, and was calculated and intended to, and in fact did, harm **Plaintiffs**, including interfering with and diverting referrals away from **Plaintiffs**.

201.    Plaintiffs have suffered substantial damages, and will in the future suffer substantial damages, al in an amount yet to be determined, as a direct and proximate result of **Defendants'** misconduct.

## COUNT V – DEFAMATION

202.    For their fifth cause of action against **Defendants, Plaintiffs** hereby incorporate by reference the above allegations contained above as through fully set forth herein.

203.    **Defendants** have made or caused to be made, and continue to make or cause to be made, false and defamatory statements of and concerning **Plaintiffs**.

204.    Such statements include, but are not necessarily limited to the following: falsification or misrepresentation of medical records in connection with statements regarding **Dr. Sciolaro's** standard of care in the cases most recently submitted to the Kansas Board of Healing Arts, which statements **Defendants** know are not supported by the medical records; statements suggesting or implying that **Dr. Sciolaro's** privileges had been suspended, but concealing the fact that such privileges were reinstated after full

49

medical records were considered; statements suggesting or implying that **Dr. Sciolaro** standard of care has been the subject of peer review or quality concerns, but concealing the fact that such matters were fraudulently and wrongfully asserted based on medical records that have been either misrepresented or withheld; statements implying or suggesting that **Dr. Sciolaro** is no longer practicing in the area, or is no longer or practicing at all.

205.    Such statements have been made or caused to be made to third persons, including to competing physicians, referring physicians, patients, potential patients, and other persons outside the scope of legitimate peer review or risk management personnel.

206.    **Defendants** have made, and continue to make such statements with actual knowledge that the same are false, and/or with reckless disregard for their truth or falsity.

207.    The dissemination of such statements is malicious, and without legal privilege, justification or excuse, and specifically calculated and intended to harm **Plaintiffs**.

208.    As a direct and proximate result, **Plaintiffs** have been harmed, including with respect to **Plaintiff's** professional and business reputation, and **Plaintiff's** ability to obtain referrals, obtain privileges at other facilities, or to practice medicine, including cardiothoracic and vascular surgery.

## COUNT VI – FALSE LIGHT PUBLICITY

209.    For their sixth cause of action against **Defendants**, **Plaintiffs** hereby incorporate by reference the above allegations contained above as through fully set forth herein.

210.     Defendants have made, and continue to make, publications to third persons that represent or hold Plaintiffs out in a false light. Such publication includes implications that there are peer review matters pending regarding **Dr. Sciolaro's** standard of care, that **Dr. Sciolaro's** privileges have been suspended, that **Dr. Sciolaro** is no longer practicing in the area, or is no longer or practicing at all. Such publication creates a misleading and false light regarding **Plaintiffs** without the publication further disclosing that the peer review matters were premised upon falsified or concealed records, that Dr. Sciolaro's privileges were actually reinstated upon full records being considered, and that Dr. Sciolaro only left PMC's medical staff and continued practicing elsewhere.

211.     Under the circumstances, the misrepresentations about Plaintiffs would be highly offensive to a reasonable person.

212.     As a result of such false light publicity, Plaintiffs have been, and continue to be, damages in an amount yet to be determined.

## COUNT VII – FRAUD/MISREPRESENTATION

213.     For their next cause of action against **Defendants, Plaintiffs** hereby incorporate by reference the above allegations contained in above as through fully set forth herein.

214.     **Defendants** have caused one or more misrepresentations of fact to be made, including following: misrepresentations regarding the statistical outcomes of **Dr. Sciolaro's** surgical procedures, or that of other competing surgeons, and reporting of manipulated data to recipient agencies or groups; and misrepresentation of the facts underlying certain patient cases presented or submitted for peer review, including

intentionally withholding material medical records or facts from outside reviewers, and misrepresenting or withholding material medical records or facts from the Kansas Board of Healing Arts in submitting standard of review cases involving **Dr. Sciolaro**.

215.    Such misrepresentations were knowingly made or perpetuated by **Defendants**.

216.    Such misrepresentations were made for the purpose of inducing actions, and did induce actions, in reliance upon the same, including actions injurious to **Plaintiffs**.

217.    As a proximate result, **Plaintiffs** have been injured and damaged, in amounts yet to be determined.

<u>COUNT VIII – INTENTIONAL INFLICTION</u>
<u>OF EMOTIONAL DISTRESS</u>

218.    For his next cause of action against **Defendants**, **Dr. Sciolaro** hereby incorporates by reference the above allegations contained above as through fully set forth herein.

219.    **Defendants'** conduct, all as alleged above, was intentional or in reckless disregard of **Dr. Sciolaro**.

220.    **Defendants'** conduct was extreme and outrageous.

221.    As a direct and proximate result, **Dr. Sciolaro** has suffered extreme and severe mental distress.

222.    **Dr. Sciolaro** is entitled to recover damages in an amount yet to be determined.

## COUNT IX – CIVIL CONSPIRACY

223.    For their next cause of action against **Defendants, Plaintiffs** hereby incorporate by reference the above allegations contained above as through fully set forth herein.

224.    Each **Defendant** is liable for the torts alleged above, by reason of the existence of a civil conspiracy between **Defendants**

225.    There was a meeting of the minds between **Defendants** as to the accomplishment of one or more certain objectives, including but not limited to: eliminating **Dr. Sciolaro** as a competitor at **PMC**, the manipulation or falsification of records, the initiation and pursuit of predatory and peer review cases against **Dr. Sciolaro** based upon misrepresentation or concealment of medical records, suspension of **Dr. Sciolaro's'** privileges based upon misrepresented or concealed medical records, submission of standard of care cases to the Kansas Board of Healing Arts based upon misrepresented or concealed medical records, procuring or prompting licensure action against **Dr. Sciolaro**, or adverse National Practitioner Data Bank reporting, to eliminate **Plaintiff** as a competitor, or otherwise hinder or preclude him from continuing to obtain referrals or business.

226.    As alleged above, there were numerous unlawful, overt acts committed in furtherance of such conspiracy, including the numerous tortious acts alleged above.

227.    As a proximate result of such unlawful acts, **Plaintiffs** have been damaged, in amounts yet to be determined.

## COUNT X – BREACH OF CONTRACT

228.    For his next cause of action against **PMC**, **Dr. Sciolaro** hereby incorporates by reference the above allegations contained above as through fully set forth herein.

229.    **PMC** and **Dr. Sciolaro** were parties to the June 12, 2007 Confidentiality and Settlement Agreement.

230.    Heretofore, **Dr. Sciolaro** has substantially and fully performed all of his obligations under such Agreement.

231.    **PMC**, however, materially breached the terms of the Agreement, including in the following resects:

       a.  **PMC** failed to follow bylaws and established protocol procedures for referring cases for outside review, in bad faith submitted cases for outside review that did not meet the protocol or threshold for review, and in bad faith submitted cases for outside review without first reviewing them internally;

       b.  **PMC** in bad faith submitted incomplete and misleading materials to outside the reviewer;

       c.  **PMC** in bad faith initiated numerous additional predatory and sham peer review cases against **Dr. Sciolaro**, and failed to proved **Dr. Sciolaro** with same rights in peer review process as accorded physicians on staff;

       d.  On recent cases reviewed, **PMC** failed to permit **Dr. Sciolaro** to attend or comment at the committee hearings or meetings on such

cases as required, or otherwise deprived him of procedural rights to which he was entitled.

232. PMC's actions also constitute breach of the implied covenant of good faith and fair dealing.

233. As a result of such breach, **Dr. Sciolaro** has been damaged.

234. In addition, **PMC's** first in time material breach excuses further performance by **Dr. Sciolaro**, and precludes **PMC** from enforcing against **Dr. Sciolaro** the terms of the release contained in said Agreement.

## COUNT XI – FRAUD IN THE INDUCEMENT OF CONTRACT/RELEASE

235. For his next cause of action against **PMC**, **Dr. Sciolaro** hereby incorporates by reference the above allegations contained in ¶¶1-____ above as through fully set forth herein.

236. In consummating the June 12, 2007 Confidentiality and Settlement Agreement, **PMC** expressly and impliedly represented that it intended to and would comply with the covenants and promises contained in the Agreement, including the express covenants with respect to the rights and case participation opportunities that **Dr. Sciolaro** would be afforded, the same as if he were still a member of **PMC's** medical staff, in the event of any future peer review matters.

237. Such express and implied representations were made for the purpose of inducing **Dr. Sciolaro** to enter such agreement and to comply with its terms by resigning from PMC's medical staff.

238. Such express and implied representations by **PMC** were false, in that, on information and belief, **PMC** did not have the present intent upon entering such

agreement, to comply with such terms, as demonstrated by the fact that it is now known that, immediately after or even prior to entering such agreement, **PMC** initiated other bad faith and predatory peer review actions, without affording **Dr. Sciolaro** the opportunities as promised.

239.    As a result of reliance upon such representations, **Dr. Sciolaro** has been damaged.

240.    As a result, **PMC** is not entitled to enforce the release contained in such Agreement, or **Dr. Sciolaro** is otherwise entitled to rescission of his release, or other appropriate.

## COUNT XII – BREACH OF CONTRACT

241.    For his next cause of action against **PMC, Dr. Sciolaro** hereby incorporates by reference the above allegations contained in above as through fully set forth herein.

242.    **PMC's** first in time material breach of the June 12, 2007 Confidentiality and Settlement Agreement excuses further performance of that Agreement by **Dr. Sciolaro,** and precludes **PMC** from enforcing against **Dr. Sciolaro** the terms of the release contained in the June 12, 2007 Confidentiality and Settlement Agreement, and subjects PMC to the claims herein that predate such Agreement..

243.    Prior to June 12, 2007, **PMC** and **Dr. Sciolaro** were parties to an express or implied contract which included **PMC's** medical staff bylaws, as alleged above.

244.    Notwithstanding **Dr. Sciolaro's** substantial performance, **PMC** materially breached its obligations under such contract, including in the following respects:

a.   **PMC** failed to follow bylaws and procedures for referring cases for outside review, in bad faith submitted cases for outside review that did not meet the protocol or threshold for review;

b.   **PMC** in bad faith submitted incomplete and misleading materials to outside the reviewer;

c.   **PMC** in bad faith later initiated numerous additional predatory and sham peer review cases against **Dr. Sciolaro**, and failed to comply with its own protocols and bylaws;

d.   On recent cases reviewed, **PMC** failed to permit **Dr. Sciolaro** to attend or comment at the committee hearings or meetings on such cases as required by its own protocols and bylaws, or otherwise deprived him of procedural rights to which he was entitled.

e.   **PMC** failed or refused to provide nursing staff for OR procedures either elective or ER patients)

f.   PMC failed on several occasions to provide or maintain reasonable and adequate OR equipment, supplies and inventory to permit **Dr. Sciolaro** to perform surgical procedures on patients.

245.   As a result of such breach, **Dr. Sciolaro** has been damaged, including by reason of the numerous bad faith peer review actions initiated by PMC, which involve outcomes to which PMC's own breach of obligations caused or contributed.

## COUNT XIII – DECLARATORY JUDGMENT

246.   For their next cause of action against **PMC, Plaintiffs** hereby incorporate by reference the above allegations contained in above as through fully set forth herein.

247.    There is an actual controversy, and Plaintiffs are entitled to a declaratory judgment finding and declaring that:

       a.    **PMC's** first in time material breach of the June 12, 2007 Confidentiality and Settlement Agreement excuses further performance of that Agreement by **Dr. Sciolaro**, and precludes **PMC** from enforcing against **Dr. Sciolaro** the terms of the release contained in the June 12, 2007 Confidentiality and Settlement Agreement, and subjects **PMC** to the claims herein that predate such Agreement..

       b.    **Defendants** are not entitled to immunity under the Federal Health Care Quality Improvement Act of 1986 ("HCQI Act"), 42 U.S.C.A., § 1111, *et. seq.*

       c.    **Defendants** are not entitled to immunity under the provisions of K.S.A. §65-4909, §65-4929, or other provisions of Kansas law.

       d.    **Defendants'** adverse peer review actions and standard of care recommendations or determination were not in good faith, were based on false or incomplete facts, and were done in bad faith.

       e.    **Defendants'** actions outside the peer review process are not immune or privileged.

## COUNT XIV – INJUNCTION

248.    For their next cause of action against **PMC**, **Plaintiffs** hereby incorporate by reference the above allegations contained in above as through fully set forth herein.

249.    In addition to the request for relief under Count I above, **Plaintiffs** are entitled to injunctive relief to preclude Defendants from continuing their wrongful and tortious conduct.

250.    Plaintiffs are likely to suffer continuing and irreparable injury in the future, and relief in the form of an award of monetary damages is not adequate to compensate Plaintiffs from such injury.

251.    According, **Plaintiffs** request injunctive relief against **Defendants** restraining and enjoining Defendants as follows:

a.    Enjoining **Defendants** and the respective officers, directors, agents and employees, and all other persons acting or planning to act on behalf thereof, from in any manner, directly or indirectly, continuing, maintaining or renewing the conspiracy, concerted action, and from adopting or following any practice, plan, program or design, having a similar purpose or effect;

b.    Enjoining **Defendants** from further enforcing or taking any professional review action that adversely affects **Dr. Sciolaro's** privileges;

c.    Enjoining **Defendants** from further disclosing or suggesting to others, including the medical community or others, the existence of confidential peer review matters, or impling or perpetuating a perception that any of the peer review matters had merit;

d. Enjoining **Defendants** from further communicating, disseminating or implying to others, any suggestion of problems with **Dr. Sciolaro's** professional quality of care;

e. Enjoining **Defendants** from otherwise interfering with **Plaintiffs'** business relationships or disparaging **Plaintiffs**;

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

That the Court declare that Defendants are not entitled to immunity under the Federal Health Care Quality Improvement Act of 1986, or K.S.A. §65-4909, §65-4929, or otherwise;

That the Court declare **PMC's** first in time material breach of the June 12, 2007 Confidentiality and Settlement Agreement excuses further performance of that Agreement by **Dr. Sciolaro**, and precludes **PMC** from enforcing against **Dr. Sciolaro** the terms of the release contained in the June 12, 2007 Confidentiality and Settlement Agreement, and subjects **PMC** to the claims herein that predate such Agreement;

That the Court declare **Defendants'** adverse peer review actions and standard of care recommendations or determination were not in good faith, were based on false or incomplete facts, and were done in bad faith;

That the Court declare **Defendants'** actions outside the peer review process are not immune or privileged.

That the Court award Plaintiffs actual damages as proved at trial on all Counts of the Complaint;

That the Court award Plaintiffs treble and other statutory damages as allowed by law;

That the Court enjoin **Defendants** and the respective officers, directors, agents and employees, and all other persons acting or planning to act on behalf thereof, from in any manner, directly or indirectly, continuing, maintaining or renewing the conspiracy, concerted action, and from adopting or following any practice, plan, program or design, having a similar purpose or effect;

That the Court enjoin **Defendants** from further enforcing or taking any professional review action that adversely affects **Dr. Sciolaro's** privileges;

That the Court enjoin **Defendants** from further disclosing or suggesting to others, including the medical community or others, the existence of confidential peer review matters, or implying or perpetuating a perception that any of the peer review matters had merit;

That the Court enjoin **Defendants** from further communicating, disseminating or implying to others, any suggestion of problems with **Dr. Sciolaro's** professional quality of care;

That the Court enjoin **Defendants** from otherwise interfering with **Plaintiffs'** business relationships or disparaging **Plaintiffs**;

That the Court award punitive or exemplary damages as allowed by law;

That the Court award pre-judgment and post-judgment interest as provided by law;

That Plaintiffs be awarded reasonable and necessary attorneys' fees in the trial court and all subsequent appeals;

That the Court award Plaintiffs their taxable costs of court;

That the Court, to the extent it believes that the causes of action herein are not properly plead or entities not properly served, grant Plaintiffs leave to amend his Complaint to satisfy the Court's requirements; and

That this Court grant such other and further relief as the Court deems just and equitable in the premises.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

SLY JAMES FIRM, TRIAL LAWYERS, P.C.

By _____
Sly James, # 70326
Michael J. Mohlman, KS #19084
802 Broadway, 7th Floor
Kansas City, Mo 64105
(816) 472-6800
(816) 475-6805 (fax)
sly@slyjamesfirm.com
mike@slyjamesfirm.com

and

LAW OFFICES OF DONALD R.
WHITNEY, CHARTERED

/s/ _Donald R. Whitney_____
Donald R. Whitney KS #13268
6800 College Boulevard, Suite 630
Overland Park, KS 66211
913.323.3100
913.323.3178 (direct)
Fax: 913.663.2006
dwhitney@k-c-lawyers.com
ATTORNEYS FOR PLAINTIFFS